**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| UNITED NATIONAL INSURANCE CO., et al., <br><br> Plaintiffs, <br><br><br> v. <br><br><br> AON LTD., et al., <br><br> Defendants. | Civ. No. 04-539 |

**OPINION**

August 7, 2008                                                                                           Pollak, J.

Presently before the court are a variety of motions *in limine* from both parties.

Oral argument was held on July 24, 2008, and these motions are now ripe for disposition.[1]

**I.     Aon's motion to preclude evidence of "pure omissions"**

Aon has filed a motion *in limine* to exclude evidence of seven categories of

materials that were not disclosed by Aon to RAS on the ground that these are "pure

omissions," and that, as a matter of law, Aon had no duty to disclose them.

Specifically, Aon objects to the admissibility of evidence of the following

omissions: (1) the relationship between the premiums charged by the UNG and the rates

---

[1] The parties are more than familiar with the factual background of this case, so the court will not recite the facts except as necessary to support its rulings.

published by the Insurance Services Office ("ISO"), (2) the frequency of claims filed

between 1990 and 1992, (3) the American Re-Insurance Company's ("Am Re")

unfavorable review of the Contractors Program, (4) the supplemental package of

information provided to U.S.-based reinsurers, (5) the loss ratios experienced by Aon's

Pasadena office, (6) UNG's disclaimer of Aon's disclosures, and (7) the inclusion in the

program of several insureds with poor historical records (referred to by UNG as the

"nightmare risks").

The motion is based on Restatement (Second) of Torts § 551,[2] which provides:

(1) One who fails to disclose to another a fact that he knows may justifiably
induce the other to act or refrain from acting in a business transaction is
subject to the same liability to the other as though he had represented the
nonexistence of the matter that he has failed to disclose, if, but only if, he is
under a duty to the other to exercise reasonable care to disclose the matter
in question.
(2) One party to a business transaction is under a duty to exercise
reasonable care to disclose to the other before the transaction is
consummated,
    (a) matters known to him that the other is entitled to know because
of a fiduciary or other similar relation of trust and confidence
between them; and
    (b) matters known to him that he knows to be necessary to prevent
his partial or ambiguous statement of the facts from being
misleading; and
    (c) subsequently acquired information that he knows will make
untrue or misleading a previous representation that when made was
true or believed to be so; and
    (d) the falsity of a representation not made with the expectation that
it would be acted upon, if he subsequently learns that the other is
about to act in reliance upon it in a transaction with him; and

---

[2] The parties agree that Pennsylvania law, which governs this diversity action, follows
§ 551 of the Restatement.

> (e) facts basic to the transaction, if he knows that the other is about
> to enter into it under a mistake as to them, and that the other, because
> of the relationship between them, the customs of the trade or other
> objective circumstances, would reasonably expect a disclosure of
> those facts.

Restatement (Second) of Torts § 551 (1977).  Subsection (1) establishes that there is no

general duty for parties dealing with each other at arms-length to disclose facts to one

another.  Subsection (2) lists five situations in which such a duty is imposed.  Aon argues

that none of the five situations listed in § 551(2) apply here.

UNG claims that the seven items it seeks to introduce should have been disclosed

under § 551(2)(b), because their disclosure was necessary to prevent the materials that

Aon did disclose from being misleading.  The comments relevant to § 551(2)(b) clarify

that "[a] statement that is partial or incomplete may be a misrepresentation because it is

misleading, when it purports to tell the whole truth and does not. . . .  When such a

statement has been made, there is a duty to disclose the additional information necessary

to prevent it from misleading the recipient."  *Id*. cmt. g.  The comment also references

§ 529, which states in the text that "[a] representation stating the truth so far as it goes but

which the maker knows or believes to be materially misleading because of his failure to

state additional or qualifying matter is a fraudulent misrepresentation," and in the

comments that "a statement that contains only favorable matters and omits all reference to

unfavorable matters is as much a false representation as if all the facts stated were

untrue," Restatement (Second) of Torts § 529 cmt a.  UNG's argument is that all of the

information omitted was necessary to temper or qualify Aon's positive representations about the performance of the Contractors Program, and thereby keep those representations from being misleading.

Before describing the information omitted in some detail, it is important to understand what information Aon did provide to RAS. According to UNG, the most important information provided was a series of loss ratios—*i.e.*, ratios of aggregate claims against the Program to aggregate premiums. UNG Ex. 3-6. Various RAS personnel testified that, a program of reinsurance is profitable so long as the loss ratio remains below 70%.[3] UNG Ex. 7 & 9. Loss ratios are not static; rather, they are snapshots of how a program of insurance or reinsurance is performing at a given time. As premiums are collected and claims are asserted, the loss ratio of a program changes. As time goes on and additional losses become more and more unlikely, the loss ratio of a program "matures" into a final value.

According to Aon expert Robert Hall, the loss ratio is the most important statistic that potential reinsurers consider in deciding whether to accept a reinsurance placement. UNG Ex. 8. Presumably, reinsurers have some understanding of how loss ratios tend to behave over time, which allows them to evaluate a program's likely profitability based on immature loss ratios.

It appears from the evidence submitted that Aon provided to RAS a series of loss

---

[3] To be clear, RAS is not a party to this action, but some of its employees were deposed and are expected to be called as witnesses at trial.

ratios covering various aspects of the Contractors Program.  According to UNG, one of the most imporant—and ultimately most misleading—was Aon's alleged representation that the loss ratio on the 1990 Contractors Program, which stood at 47%, was mature or nearly so.  UNG Ex. 9.  It is UNG's position that Aon had reason to know that the 1990 Program was definitively not mature, and that the loss ratio could be expected to continue increasing.

With this understanding of what information was proceeded, the court will proceed to consider the seven items not provided.

The ISO premium information, which was part of a supplemental package provided to U.S.-based reinrurers, but not to RAS, is a schedule that compares the premiums charged in the Contractors Program to the benchmark premiums listed by the ISO.  The ISO is a trade organization, and at least one witness has testified that its benchmark values are widely used in the industry to determine whether premiums are generally in line with common industry practice.  UNG Ex. 13, at 86:21-24.  The schedule discloses that the vast majority of accounts were priced well below the ISO benchmark rate.  UNG Ex. 14, at AON00042568.  This is relevant, according to UNG, because it apprises the reader that the insurance contracts that made up the Contractors Program were sold at a substantial discount from the industry norm, thus raising a red flag as to the probability that the premiums charged would not profitably cover the future losses.  UNG argues that this omission rendered the loss ratios misleading because knowing that the

premiums were sold at a substantial discount would lead an insurance professional to accord substantially less weight to immature loss ratios than she otherwise would..

The claims frequency data, also part of the supplemental package, is a series of tables showing the number and value of claims asserted for the 1990-92 years of the Contractors program.  It also showed how the number of claims increased over time.  In particular, it showed that 35 months after inception of the 1990 policy year, the number of claims asserted for that policy year was still very much on the rise.  *See* UNG Ex. 14, at AON00042591.  These data, according to UNG, were necessary to complete the story of the risk of loss going forward, particularly given that Aon represented to RAS that, in its view, the 1990 claim year was mature.  If nothing else, the claims frequency data would have, according to UNG, qualified that representation by showing that the 1990 policy years was not behaving like a mature program, inasmuch as the number and value of claims coming in had not tapered off.

The supplemental package contained other information that, according to UNG, was required to make the information to disclosed to RAS not misleading.  UNG observes that it was Aon's usual practice to send all potential reinsurers the same information, *see* UNG Ex. 16, at 191-92, and argues that, in sending the supplemental package to other reinsures, Aon signaled its awareness that the information was necessary.

The Am Re report is an audit that Am Re performed at UNG's request on the Contractors Program.  The report, the location of which does not appear to be identified

in the parties' submissions, apparently projected that loss ratios for the Program would run higher than 200% (keeping in mind that 70% is the upper limit of profitability).  UNG argues that this information substantially qualified the loss ratios provided by Aon by demonstrating that the loss ratios could be expected to rise much more than their immature values would suggest.

Apparently as early as 1992, Aon was aware that its Pasadena office, which is represented to be the largest producer of Contractors Program business, was experiencing loss ratios in excess of 55% and trending higher.  By 1993, the loss ratio for that office was 107%.  UNG Ex. 23.  This, according to plaintiff, was a red flag that the overall loss ratios provided were misleading inasmuch as the ratios were increasing quickly at the largest office.

In 1993, UNG executed a letter to Aon that purported to disclaim any knowledge of the contents of the "placement slip" that Aon presented to RAS.  UNG Ex. 31.  The placement slip contained the loss ratios that UNG alleges were misleading.  According to UNG, a reinsured disclaiming a payment slip is an occurrence that bucks common industry practice; rather, the accepted practice is for the reinsured to back up all of the information provided to a potential reinsurer.  This, according to UNG, was another a red flag that the figures provided had not been approved by UNG, the primary insurer, and thus were of diminished value.

UNG claims that some of the entities insured by the Program had particularly poor

-7-

loss histories, and that the existence of these risks should have been disclosed to provide an accurate picture of what losses could be expected in the future.  In particular, plaintiff argues that the information Aon did provide that lauded its vetting process for the insured risks was misleading, *see* UNG Ex. 2, given that Aon knew that some of the risks were not as favorable as its laudatory language would suggest.

As to all of these omissions, the thrust of Aon's argument is that the loss ratios required no additional disclosures because they were complete in themselves.  They were, according to Aon, a mere snapshot of the program's performance to date, unadorned by any representations about future performance.  UNG, on the other hand, argues that, in the context of the insurance industry, the loss ratios provided by Aon looked very favorable, and their disclosure was designed to create the impression that the program was performing very well.  By presenting those ratios, Aon knew that it was presenting information favorable to its position; this, according to UNG, was misleading given that Aon possessed information that would have qualified the impression given by the loss ratios.

Neither party addresses the division of labor between the court and jury as to who decides whether a (2)(b) duty exists.  On the one hand, the Superior Court has observed that the existence of a duty is a question of law for the court to decide.  *Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 550 (Pa. Super. Ct. 2005).  But it is also established law that whether a representation is false, as it must be for liability to attach,

is a question of fact for the jury.  *Kibler v. Prudential Ins. Co. of Am.*, 10 A.2d 916, 917

(Pa. Super. Ct. 1940).  A necessary corollary to the proposition that the falsity of a

representation is a question of fact is, it would seem, that it is for the jury to decide

whether a statement is rendered false by its incompleteness.  *Arboireau v. Adidas-*

*Salomon AG*, 347 F.3d 1158, 1165 (9th Cir. 20003) ("The extent to which a

representation is misleading, thus imposing a duty of disclosure, is a question of fact.")

(applying Oregon law); *see also* Restatement (Second) of Torts § 521 cmt. m.

In the court's view, all of the alleged omissions are things that could, arguably at

least, render Aon's disclosures misleadingly incomplete.[4]  In reaching this conclusion,

Restatement § 529, which, via the § 551(2)(b) comments, is incorporated by reference

---

[4] To pick up on Aon's odometer hypothetical from oral argument, consider a situation in which the seller of an automobile claims that the odometer reads 10,000 miles, knowing that, between the time of negotiating the sale and the actual delivery of the automobile to the buyer, the automobile will be driven an additional 5,000 miles.  The typical buyer might expect some increase in the odometer reading between the negotiation and delivery, but probably would not expect a 5,000-mile increase.  The buyer, then, depending on the specific facts, might have at least a colorable argument that the seller's representation about the odometer reading was misleadingly incomplete because a reasonable buyer would expect that, and would reasonably rely on the assumption that, the odometer reading provided at the time of negotiation would remain relatively static between the time of the negotiation and the time of the delivery of the automobile.

This situation is potentially similar.  UNG's argument is that, even if the loss ratios provided were technically accurate (keeping in mind that UNG does not concede that they were), Aon possessed information that made it apparent that the ratios provided were on the verge of substantial growth—much more growth than one would expect from a typical property and casualty insurance program, and growth that would move the program from a relatively profitable program to an extremely unprofitable one.  On the evidence presented here, the court believes that this argument can go to the jury.  Of course, it may well be that the jury finds itself unpersuaded that a reasonable reinsurer would be misled by (or would rely upon) the loss ratios provided because a reasonable reinsurer would understand the limitations of those statistics and would not assume any particular rate of growth.

into § 551(2)(b), is particularly instructive.  Section 529's comment (a) explains that "a prospectus that accurately states the assets, bonded indebtedness and net earnings of a manufacturing corporation but omits any reference to its floating debt is a false representation of the financial position of the company."  Restatement (Second) of Torts § 529 cmt. a.  Here we have packages of information designed to provide a snapshot of the performance of the Contractors Program.  Those packages disclosed various favorable loss ratios, but allegedly omitted information from which one could project that the loss ratios provided were on the verge of becoming unfavorable.  The claims-frequency data could be seen as necessary to qualify both the 1990 loss ratios themselves, and the representation that the 1990 program was mature.  The ISO premium information, the Am Re report, the information on the Pasadena office, and the other information in the supplemental package could be viewed as indicators that the loss ratios presented were on the verge of exploding.  The UNG disclaimer could be seen as an indicator that the loss ratios presented were of diminished reliability.  Finally, the so-called nightmare risks could be regarded as necessary to qualify Aon's representations about the strictures of the underwriting process.  In sum, on the basis of the information omitted, a jury could conclude that Aon's packages of information stated the truth so far as it went, but were misleading because they failed to state necessary qualifying material.  Thus, the court's view is that plaintiff may present all of this evidence to the jury, with the understanding that the jury will receive a § 551(2)(b) instruction as to the parameters of defendant's duty

to disclose.

Plaintiff further argues that all of the omitted information was "basic to the transaction" under § 551(2)(e).  According to the comments, this is a narrow duty that applies only to facts "that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with."  *Id.* at cmt. j.  The thrust of plaintiff's argument is that industry custom, which calls for the disclosure of all facts material to the risk, and the centrality of risk information to a reinsurance transaction, counsel in favor of finding the undisclosed information "basic to the transaction."

That industry custom is relevant is clear from the text of § 551(2)(e).  UNG cites a variety of sources, including witnesses in this case and the Lloyd's of London Code of Practice, for the proposition that it is expected in the insurance industry that a reinsurance broker disclose the kind of information withheld here.  UNG Ex. 32, at AON 00228883; Ex. 34, at 64.  Aon, in denying the applicability of § 551(e)(2), relies primarily on the argument that the material not disclosed was not important enough to qualify as basic to the transaction, but does not squarely address plaintiff's contentions with regard to industry custom.[5]  UNG also cites *Youndt* for the proposition that a fact becomes basic to

---

[5] Aon references the difference between UNG's duty to RAS—the duty of utmost good faith—and Aon's duty to RAS.  According to Aon, while UNG, as the reinsured, was bound by a duty of full disclosure, Aon's duty ran primarily to UNG, and any duty to RAS was attenuated at most.  But, from the evidence presented by defendant, it is not clear that Aon's contention that the duty running from a reinsurance broker to the reinsurer is so diminished is in line with industry norms and expectations, which, through Restatement § 551(2)(e), find their way into the

the transaction when its existence (1) substantially alters the allocation of costs, and (2) frustrates a key purpose of the transaction.  868 A.2d at 551.  To be clear, *Youndt* is terse on the basic-facts issue, but it does seem to take these two factors into account.  Here, from what the court has been apprised of the information not disclosed, it does appear that the information might have substantially altered the allocation of cost and risk.

Because the question of whether these disclosures concerned facts basic to the transaction depends so heavily on contested descriptions of industry custom, the court must present the issue to the jury.  As the Restatement prescribes, "[i]f there are disputed facts bearing upon the existence of the duty, as for example . . . the customs of the particular trade, . . . [those facts] are to be determined by the jury under appropriate instructions as to the existence of the duty."  Restatement (Second) of Torts § 551 cmt. m.

Accordingly, the court will deny defendant's motion to preclude evidence of the various omissions.  Those omissions may be presented to the jury, and the jury will be instructed as to the contours of Aon's alleged duty.

## II.    UNG's motion to preclude admission in evidence of the arbitration record

This motion raises one of the key pre-trial disputes between the parties.  The parties take fundamentally different views of the relationship between the present action and the prior arbitration between UNG and RAS, in which RAS was awarded partial

law of negligent misrepresentation.

rescission of the UNG-RAS reinsurance contract.[6]  Aon characterizes the present action as one to determine, within the scope of the alleged misrepresentations presented to the arbitration panel, where the fault, if any, lies.  UNG, on the other hand, views this action as a broader proceeding to determine, in light of all evidence available now, (1) whether UNG is liable to RAS only vicariously through Aon, and, if not, (2) the degree of fault, if any, for RAS's injuries that is attributable to Aon.

To understand the relevance of the record of the arbitration proceeding to this action, one must begin by recognizing that the arbitration panel issued neither findings of fact nor conclusions of law.  Rather, it issued a bare award, unadorned by any reasoning or explanation.  At oral argument, UNG's counsel stated that the only thing we know from the arbitration panel's decision is that, in the panel's judgment, someone did something wrong.  Aon's counsel disagreed, arguing that even that much is not clear from the arbitration panel's decision, given that the panel was not bound to follow the law of any jurisdiction, but rather was free to achieve a desired result based on its own notions of fairness and equity with respect to industry mores, and without reference to any legal framework or any determination of formal legal liability.  On this question, the court agrees with the defense.  Given the unreasoned nature of the arbitration award and the

_____

[6] As a consequence of the partial rescission, UNG was required to pay RAS back for the losses RAS had absorbed on the rescinded portion of the reinsurance contract.  UNG claims damages in excess of $20 million.

arbitration panel's freedom to depart from any jurisdiction's governing law,[7] we can draw no findings of fact or conclusions of law from the arbitration panel's award.  We begin this trial without liability on anyone's part having been established in a prior proceeding.

In this respect, the posture of our case is analogous to that of cases in which a plaintiff sues for indemnity or contribution following a settlement agreement with a third party.  Under those circumstances, it is widely understood that nothing carries over from the prior settlement, and it becomes plaintiff's burden to prove (1) the "actionable facts" on which plaintiff's liability depends, (2) that the settlement amount was reasonable, (3) that plaintiff was liable to the injured party, and (4) that plaintiff's liability was purely secondary.  *Tugboat Indian Co. v. A/S Ivarans Rederi*, 5 A.2d 153, 156 (Pa. 1939).  In such a proceeding, the defendant is free to argue—as Aon may do here—that the plaintiff was not in fact liable to the injured party, and that the plaintiff therefore has no liability to shift through indemnity or contribution.

Aon has cited indemnity and contribution cases in which a court has expressly looked to the record of a prior proceeding to determine what facts were established.  *E.g.*, *Builders Supply Co. v. McCabe*, 77 A.2d 368, 372 (Pa. 1951); *City of Wilkes-Barre v. Kaminsky Bros., Inc.*, 804 A.2d 89, 94 (Pa. Cmmw. Ct. 2002); *BCS Ins. Co. v. Guy Carpenter & Co.*, 490 F.3d 597, 603-04 (7th Cir. 2007).  This court, however, does not dispute that any prior findings of fact would be relevant.  As the *Builders Supply* court

---

[7] The UNG-RAS arbitration agreement expressly required that the arbitrators base their decision on insurance industry norms and customs.

-14-

observed, "the plaintiff, in an action to recover indemnity, is bound by all findings and conclusions without which the [prior] judgment could not have been rendered." 77 A.2d at 372. Here, however, there was no prior judgment; indeed, there was not even a conclusion of formal legal liability. In *BCS*, a case involving a prior arbitration rather than a prior court proceeding, the Seventh Circuit ruled against an indemnity plaintiff on the ground that the arbitration panel's specific ruling established the causal negligence of a party other than the indemnity defendant, thus defeating the claim for indemnity. 490 F.3d at 603-04. In addition, the undisputed evidence established that the indemnity plaintiff had borne losses, not solely because of the indemnity defendant's fault, but because of another party's poor management of an insurance program. *Id.* at 604. To whatever extent the *BCS* court relied on the record in the prior arbitration—and it does not appear that the court relied exclusively on that record—the court relied on the arbitration panel's express finding as to which party was at fault for the loss at issue, not on its own divination of the grounds for the arbitration award.[8]

Given the posture of the case at bar, the court does not believe that the arbitration record is as important as Aon would have it. It will not be the jury's job to sift through the arbitration record to divine what the arbitrators may have been thinking. Whatever they may have thought, those thoughts were not reduced to findings of fact or conclusions

_____

[8] There is an open question in Pennsylvania law as to whether, in an indemnity or contribution suit, the court would be bound by prior findings made by an arbitrator, rather than by a court. Because the arbitration panel here made no findings at all, this question need not be addressed.

-15-

of law, and thus cannot be recognized here.  It will rather be the jury's job to decide based on the evidence presented in this case which party or parties are liable for the harm, and, if there is liability, its character and degree.  This is not to say that portions of the arbitration record may not be relevant and admissible; it is merely to say that the court cannot accept Aon's contention that the record, as a whole, is a necessary piece of evidence.

UNG's primary objection to various portions of the arbitration record is that they constitute hearsay not covered by an exception.  The parties seem to agree that much of the material in the arbitration record consists of out-of-court statements not made by any witness in this case.  Aon, however, argues that those statements would not be admitted for their truth, but to give the jury a means of understanding why the arbitrators reached their decision.  As the court has already explained, however, why the arbitrators reached their decision is not properly at issue in this case; what are at issue are all of the underlying questions surrounding the conveyance of allegedly false information by Aon or UNG to RAS.  The arbitration record provides substantive evidence relating to how those questions might be resolved.  Thus, it is the court's view that, as a general matter, most of the materials in the arbitration record would only be relevant insofar as they would be offered for their truth, which would also render them hearsay.

Given these observations, the court is not in a position to offer a blanket ruling on the admissibility of the arbitration record.  Instead, the court will have to rule separately

on each piece of the record sought to be admitted.

At this stage, the parties have identified two more specific disputes with regard to the arbitration record.

The first concerns the admissibility of two expert reports that were made part of the arbitration record. In a report prepared for this case, Aon expert Sir Alan Traill, after explaining his conclusion that Aon acted properly toward RAS, opines that he has read and agrees with the report of former UNG expert Dennis Gentry, which was submitted to the arbitration panel. This portion of the Traill report is quite short, *see* UNG Ex. C, at 10, and, at his deposition, Traill conceded that he did not rely on the Gentry report in any strict sense; indeed, he had already reached his own conclusions when he first read it, *see* UNG Ex. E, at 79. Aon points out that Traill also praised the Gentry report for its explanation of "utmost good faith" in the insurance industry, but this does not seem to indicate reliance. *Id.* at 78. Plaintiff complains that this is a back-door attempt to sneak in the otherwise inadmissible Gentry report by having a defense expert pass on it.

Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

-17-

Fed. R. Evid. 703.

Aon argues that the opinions of other experts qualify as the sort of thing on which an expert in the insurance industry would reasonably base his opinion. But the cases Aon cites are about an expert incorporating the finding of another kind of expert, or the data used by a similar expert, into his analysis; they do not involve an expert first forming his opinion and then reaching out to evaluate the unpublished report of an expert in a prior proceeding. *E.g.*, *In re Custom Distrib. Servs.*, 224 F.3d 235, 246 (3d Cir. 2000) (dealing with real estate appraiser's use of environmental expert's assessment of contamination in reaching an opinion on property value); *United States v. Genser*, 582 F.2d 292, 298 (3d Cir. 1978) (accountant using data provided in government audit). Aon further argues that Rule 703 does not require that something be the primary basis for an expert's opinion to be admissible, but only requires that it be a basis.

Given the perfunctory nature of the discussion of the Gentry report in Traill's report and Traill's deposition testimony to the effect that he formed his entire opinion before reading the Gentry report, it is the court's view that Traill's main opinion is not based at all on the Gentry report. The only portion of his opinion that appears to utilize the Gentry report is Traill's rather perfunctory statement of agreement with the Gentry report. That, however, does not qualify as relying on the Gentry report. Moreover, the court notes that Rule 703 refers to "facts or data" on which an expert opinion is based;

-18-

here, the portion of the Genry report cited by Traill consists of Gentry's analysis, not the underlying facts or data on which Gentry's opinion was based.  It is also worth pointing out that the court is not convinced that an unpublished expert report from a prior proceeding is material "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703.  Finally, it does not appear that the Gentry report would be at all helpful to the jury in understanding Traill's opinion.  After all, Traill conceded that his opinion was formed before reading the Gentry report, so surely Traill can adequately explain his opinion to the jury without reference to Gentry.  Thus, if there is any probative value to the Gentry report, it cannot outweigh the prejudice of admitting into evidence an expert analysis that cannot be cross-examined because the of the expert's absence.  In sum, it does, as UNG's argues, seem that this really is an attempt to circumvent the inadmissibility of the Gentry report on hearsay grounds by having Traill, as an afterthought to his main opinion, mention it.

Similarly, in his report, Aon expert William Barbagallo, in a perfunctory paragraph exhibiting no original analysis, expresses his agreement with the report of former UNG expert Charles Henderson, which was submitted to the arbitration panel.  UNG Ex. B, at 14.  As with Traill, there is no indication that Barbagallo actually used the Henderson report to aid him in reaching his conclusions; rather he appears only to have read and agreed with it after coming to his own conclusions.  For the same reasons, the court is of the view that the Henderson report should not be admitted.

The second specific dispute on the arbitration record concerns alleged admissions of fact made by UNG's counsel during the course of the arbitration proceeding.  The court begins with the observation that attorneys are generally their clients' agents, and thus are in a position to make admissions of fact that can be admissible in a subsequent proceeding.  Even cases that place limits on the admission of prior attorneys' statements accept this general principle.  *See United States v. McKeon*, 738 F.2d 26, 30, 33 (2d Cir. 1984) (limiting the admission of prior attorneys' statements in criminal cases to those predetermined to be inconsistent with the position taken by the defendant in the present proceeding).

That principle having been announced, the court does not believe it can responsibly move beyond generalities at this stage.  In what appears to be a generous effort to relieve the court of the tedium of ruling on the various alleged admissions one-by-one, the parties have not presented the court with the specific portions of the arbitration record that are alleged by Aon to contain admissions of fact.  Specificity is important here because only admissions of fact may be admitted; legal argument and equivocal statements may not.  In addition, UNG has presented a Rule 403 argument that any admissions would be unduly prejudicial by suggesting to the jury that there was something wrongful about UNG's change of position on the question of its and Aon's liability to RAS.  This sort of Rule 403 determination is necessarily fact-bound, and the court cannot say without knowing what specifically is at issue whether there is any

-20-

substantial danger of unfair prejudice.

The court appreciates the parties' attempt to spare it from combing through and ruling on the various alleged admissions of fact one-by-one; it would appear, however, that nothing less specific will do. Therefore, Aon will be ordered to provide to UNG a specific list of the admissions of fact it would like to admit, and the parties will be ordered to work through that list to determine if any agreement can be reached. Any items on which agreement cannot be reached will have to be submitted for the court's review in a supplementary pre-trial motion.

### III.  Aon's motion to exclude evidence of alleged misrepresentations not presented to the arbitration panel

Aon seeks to exclude evidence of three alleged misrepresentations that were not presented to the arbitration panel: (1) the loss ratios specific to Aon's Pasadena office, (2) the so-called nightmare risks, and (3) Aon's alleged manipulation of the premium and loss statistics.

This motion also implicates the relationship between the prior arbitration and the present action. It is Aon's position that, since both indemnity and contribution necessarily derive from a prior liability decision, only those matters presented in the initial proceeding are properly at issue. UNG, on the other hand, argues that because the indemnity/contribution defendant was not a party to the initial proceeding, the evidence presented in the indemnity/contribution action will naturally differ in some respects from

that presented to the initial tribunal.

Both parties argue the motion as though indemnity and contribution may, for purposes of this motion, be analyzed together.  The court is unsure of that they can, and will begin by considering contribution alone.

Contribution lies when multiple persons commit torts which are all substantial factors in causing an indivisible injury.  *Capone v. Donovan*, 480 A.2d 1249, 1251 (Pa. Super. Ct. 1984).  The joint tortfeaesors need not have acted together, nor must they have committed the same tort.  It is sufficient that they both committed torts that contributed to the ultimate indivisible injury.  *Mattia v. Sears, Roebuck & Co.*, 531 A.2d 789, 791 (Pa. Super. Ct. 1987).  "[T]he party seeking contribution must stand in the shoes of that original plaintiff and prove that the new defendant was a joint tortfeasor in that his tortious conduct also caused the harm at issue."  *Id.*

Here, it is argued by UNG that Aon's negligent misrepresentations were at least a joint, substantial cause of RAS's injury.  The injury is understood to be RAS's loss on the Contractors Program.  As to the contribution cause of action, it would seem that evidence of additional misrepresentations that arguably contributed to RAS's injuries should be fair game, since the question for the jury is the degree to which each party's actions were responsible for the ultimate harm.  Indeed, it is UNG's burden, under *Mattia*, to undertake to prove Aon's tortious conduct.  Because Aon's conduct was not directly at issue in the arbitration proceeding, it would seem neither surprising nor problematic that the scope of

its allegedly tortious conduct may be broader than was presented in that proceeding, and

the court sees no reason why UNG should not be able to present in this case the full scope

of Aon's allegedly tortious behavior for purposes of apportioning fault.[9]

Defendant cites *Madigan, Inc. v. Goodman*, 498 F.2d 233, 238 (7th Cir. 1974) for

the proposition that a party "cannot seek indemnity or contribution on a theory

inconsistent with the theory on which it is held liable."  This may be true, but it is not

---

[9] Indeed, it is conceivable that contribution would lie in a case in which the contribution defendant's conduct did not come up at all in the prior proceeding.  Consider, for example, a case in which a common-law trustee invests all of a trust's money in a high risk venture, a venture which promptly loses most of the money invested in it.  Suppose further that it turns out that the venture's principal carelessly provided false information to the trustee material to the risk (say, for example, the principal, through a careless scrivener's error, stated the venture's prior-year gross revenue was $200,000, when, in fact, the correct figure was $100,000).  In such a case, the trust might well be the victim of at least two separate torts: (1) the trustee's violation of the duty of prudent investment, and (2) the principal's negligent misrepresentation.  It is conceivable that both torts could be seen as contributing to the ultimate harm, the loss of a substantial portion of the trust corpus.  Now, suppose the trust beneficiaries, on behalf of the trust, first sue their trustee.  To accelerate the litigation process, the beneficiaries do not bother developing the argument that the ill-fated investment was itself too risky to be a prudent investment; rather, they move expeditiously for summary judgment on a failure-to-diversify theory.  The lack of diversification is obvious based on evidence already in the beneficiaries' possession, and the trustee has no non-trivial defense, so the trust beneficiaries, on behalf of the trust, prevail on summary judgment without substantial discovery being conducted.  Then, the trustee sues the principal in contribution, alleging that the trust would not have made the investment had the venture's principal not provided false information, and that the trust's injury is, therefore, at least in part attributable to the principal's misrepresentation to the trust (or, more precisely, to the trustee who was, at that time, acting on the trust's behalf).  It is conceivable that the summary-judgment record might contain nothing about the principal's alleged misrepresentation—recall that very little discovery was conducted.  Yet it is obvious that evidence of the principal's misrepresentation is fair game in the contribution proceeding.  This is because the law of contribution does not require any substantive overlap between the various joint torts; it merely requires that, in the end, they causally contribute to an indivisible injury.

The same applies here: the law of contribution does not require that the scope of Aon's alleged misrepresentations match up with the scope of UNG's misdeeds; it merely requires that UNG prove that both causally contributed to RAS's loss.

applicable.  The law of contribution presumes that two or more parties commit torts—potentially separate torts—that together cause a single injury.  There is nothing inconsistent about UNG's claim that its own bad conduct, which was aired in the arbitration proceeding, was narrower and less causative than Aon's bad conduct, which was not fully aired in that proceeding; indeed, the whole point of contribution is to allow alleged joint tortfeasors to make such claims against one another.

Because Aon's additional alleged misrepresentations to RAS are relevant to UNG's contribution claim, evidence of those alleged misrepresentations will be admitted, and there is no need to consider that evidence's relationship to the indemnity claim at this time.

## IV.    Aon's motion to preclude the supplemental report of Edward McKinnon

Edward McKinnon, offered by UNG as an expert on claims reserving, filed his initial expert report on February 28, 2007, the day expert reports were due.  At his deposition on May 3, 2007, it became clear that McKinnon's underlying work product—a spreadsheet—had not been produced with the report.  There was some disagreement between the parties over whether it had been requested.  In any event, UNG agreed to produce it and to allow Aon to re-open the deposition to question McKinnon on the spreadsheet.

The follow-up deposition was scheduled for August 15, 2007.  On August 1, 2007, UNG produced to Aon a spreadsheet analyzing seven additional RAS claim files.

-24-

According to McKinnon, he realized that the seven claim files had been missed 60 to 90 days before August 15, 2007 (*i.e.*, between May 15, 2007, and June 15, 2007). In mid-September, 2007, McKinnon produced a supplemental report formalizing his analysis of the additional seven claim files. UNG offered to allow another deposition, but Aon refused.

Aon moves to exclude the supplemental report on the ground that it is untimely and prejudicial. UNG responds that, in its materials from RAS, the seven files (out of over 1,000) were missed through simple oversight, and that UNG worked diligently to complete the additional analysis. UNG further notes that its offer of an additional deposition has been on the table now for ten months and has not been accepted.

In deciding whether to exclude evidence not timely disclosed, courts in this circuit are to consider "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order." *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 704-05 (3d Cir. 1977).

Here, since Aon has had the document for ten months, and will have it for two more months before trial, with an offer to re-open the deposition, the court fails to see any real prejudice; similarly, it appears that any possible prejudice could have easily been

cured by now, and can still be cured before trial.  In addition, nothing on this record suggests any bad faith on UNG's part; rather, the error appears to have been one of simple oversight.

In sum, the *Pennypack* factors all counsel against excluding the supplemental report.  Given that it was UNG's obligation to complete its expert report in the amount of time provided, if defendant would like to re-depose McKinnon on the basis of the supplement, the court expects UNG to do everything reasonably necessary to facilitate it.

## V.     UNG's motion to preclude the testimony of Robert Hall

Aon has submitted a report prepared by Robert Hall, an experienced insurance arbitrator.  Hall's report explains the mechanics and rationale for the use of arbitration in insurance disputes, and it ruminates on what the arbitral panel in the UNG-RAS matter might have been thinking.

UNG moves to exclude the report in its entirety on the ground that it is primarily composed of speculation as to the thinking of the arbitral panel.  According to UNG, Hall's only firm conclusion is that one cannot know the reasons for the arbitration award—a proposition UNG observes is not in dispute.  Thus, it is UNG's view that Hall's one firm conclusion is unnecessary, and that his theories of what the arbitral panel might have thought about the case are unreliable under *Daubert* as based, not on any useful methodology, but, in Hall's own words, on "pure speculation."  UNG Ex. D, at 12.

Under Federal Rule of Evidence 702, courts must allow expert testimony when

"(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product

of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case."  These requirements are often referred to in

shorthand as "qualification, reliability, and fit."  *See, e.g.*, *In re Unisys Sav. Plan Litig.*,

173 F.3d 145, 156 (3d Cir. 1999).  Under the rule announced in *Daubert v. Merrill-Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and expanded in *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137 (1999), district courts must ensure that experts—scientific and

otherwise—will offer testimony that is methodologically sound and relevant to the facts

of the case before admitting their expert testimony.  *Daubert*, 509 U.S. at 590–91;

*Kumho*, 526 U.S. at 149.

In considering whether to admit expert testimony, it is important to remember that

"Rule 702 mandates a policy of liberal admissibility."  *In re Paoli R.R. Yard PCB Litig.*,

35 F.3d 717, 741 (3d Cir. 1994).

> *Daubert* does not require that a party who proffers expert testimony carry
> the burden of proving to the judge that the expert's assessment of the
> situation is correct.  As long as an expert's scientific testimony rests upon
> good grounds, based on what is known, it should be tested by the adversary
> process—competing expert testimony and active cross-examination—rather
> than excluded from jurors' scrutiny for fear that they will not grasp its
> complexities or satisfactorily weigh its inadequacies.  In short, *Daubert*
> neither requires nor empowers trial courts to determine which of several
> competing scientific theories has the best provenance.  It demands only that
> the proponent of the evidence show that the expert's conclusion has been
> arrived at in a scientifically sound and methodologically reliable fashion.

*Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (internal

quotation marks and citations omitted) (*quoted in United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004)).

According to Aon, Hall's report is admissible because it is based on his experience as an arbitrator, and that getting into the heads of the arbitrators is a key issue in this case. In Part II, *supra*, the court explained why it takes a different view of the relevance of conjecture as to why the arbitrators ruled the way they did.

In any event, the court is not of the view that Hall's experience, though substantial, gives him license to theorize on what may have been in the arbitrators' heads with the level of reliability that *Daubert* requires. *See DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (holding that an engineer should not have been allowed to speculate as to a manufacturer's motives in altering a design). Hall may be an experienced arbitrator, but that does not mean that he can reliably pronounce on what other arbitrators thought about specific evidence in a specific case.

More importantly, as explained in Part II, *supra*, what the arbitrators thought of specific evidence, or indeed of the evidence as a whole, is not pertinent, because this jury must make up its own mind about the character and degree of the parties' liability on the basis of the evidence presented to it. Thus, Hall's opinions on how the arbitrators may have regarded specific evidence, even if reliable, would not be relevant to any issue in this case, and would not, in any permissible way, assist the jury in making their own findings with regard to liability. Rather, his testimony would lead the jury down the road

of trying to guess at, and potentially give effect to, the arbitrators' understanding of liability, which would be inappropriate, and would substantially confuse the issues by leading the jury away from its obligation to form its own view of the parties' liability.

## VI.    UNG's motion to preclude reference to English court decisions

One of the key factual disputes is whether Gay & Taylor, UNG's claims administrator, utilized a philosophy of setting reserves on claims that was out-of-step with common industry practice (thus making much of the information provided on the Contractors Program's performance misleading).  William Barbagallo, an Aon expert, opines that Gay & Taylor's methodology was sound.  In so doing, he references two English court decisions—one trial-level and one appellate-level, both from the same case—that contain language approving of Gay & Taylor's methods.  The suit was brought by Arab Insurance Group, a Contractors Program participant, against Generali, a Contractors Program reinsured.  Thus, the English courts had occasion to consider the very methodology at issue in this case.

UNG claims that the English decisions are inadmissible hearsay.  Aon counters that, despite being hearsay, they are admissible under Rule 703 as material relied upon by Barbagallo.  According to Aon, it is common in the insurance industry to rely on court decisions—particularly English ones given London's status as a primary locus of insurance industry activity—regarding the propriety of industry practices.  Moreover, Aon represents that its presentation of the English decisions will be succinct, and will not

wander into any unnecessary details.

UNG argues that, as with the Gentry and Henderson reports, there is little indication that Barbagallo actually relied on the English cases, since he quotes them in what can be read as a rather off-hand manner.  While the court understands UNG's concern, it does seem that relevant English court decisions are the sorts of material on which an insurance expert would generally rely.

UNG points out that this court has cautioned that judicial opinions bear the inherent risk of being accorded undue weight.  In a case famous for reasons wholly unrelated to the issue at bar, Judge Becker ruled Judge Higgenbotham's prior findings of fact (made in a hearing on personal jurisdiction and venue) inadmissible under Rule 403:

> [S]uch findings would present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.  There would also be a prospect of confusing the issues and causing undue delay because of the time necessary to explain to the jury that the findings were made only as they relate to the preliminary matters of personal jurisdiction, venue, and service of process, all of which, of course, implicate different legal issues than are involved at trial.  This would in turn require a veritable exegesis of abstruse areas of the law.

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 585 F. Supp. 1125, 1185, *aff'd in part, rev'd in part on other grounds sub nom. In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

This case, however, does not present many of the difficulties that Judge Becker

identified.  In *Zenith*, the court was faced with findings of facts made solely for the

purpose of resolving the question of personal jurisdiction.  To utilize those findings as

evidence in a trial on the merits, the court would have had to instruct the jury at some

length about the function of evidentiary hearings on personal jurisdiction.  Here,

assuming that the discussion of the English cases is as self-limited as Aon claims it will

be, all that will be necessary is a brief instruction that the jury is to understand that the

English decisions were rendered in a proceeding with different parties and different

evidence, and that the jury is to keep in mind that it is in no way bound to give any

particular weight or consideration to those decisions.  No "veritable exegesis of abstruse

areas of the law" will be necessary.  Between that sort of instruction and UNG's able

cross-examination, the court trusts that jurors will understand the decisions as ingredients

in Barabagallo's reasoning, and not accord them any more weight that they deserve.  In

addition, since the decisions are to be considered in the context of undergirding

Barbagallo's opinions, and not on their own, though the court will permit reference to the

decisions, and though the court will admit the decisions in evidence, the court does not

anticipate that the decisions will be sent back to the jury room during deliberations, lest

the jurors get bogged down in the English courts' extended discussions of evidence

presented in that case, but not this one.

        An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED NATIONAL INSURANCE
CO., et al.,

               Plaintiffs,

    v.

AON LTD., et al.,

               Defendants.

Civ. No. 04-539

## ORDER

AND NOW, this 7th day of August, 2008, for the reasons stated in the foregoing opinion, it is hereby ORDERED that:

1.    Aon's motion to preclude evidence of "pure omissions" and evidence of alleged misrepresentations not presented to the arbitration panel (Docket No. 122) is DENIED.

2.    Aon's motion to preclude the use of Edward McKinnon's supplemental report (Docket No. 125) is DENIED; UNG is ORDERED to facilitate the taking of a supplemental deposition of Edward McKinnon if Aon so desires;

3.    UNG's motion to preclude the admission of the arbitration record (Docket No. 113) is GRANTED in part, and DISMISSED in part. The motion is GRANTED as to the use of the Gentry and Henderson reports. The motion is DISMISSED as unripe as to the alleged admissions of fact of UNG attorneys at the arbitration. Both sides are ORDERED to work together to reach agreement on the admissibility, or non-admissibility, of the materials Aon seeks to introduce. If any disputes remain, they are to be submitted to the court for disposition well before trial.

4.      UNG's motion to preclude the use of the English court decisions (Docket No. 115) is DENIED.

5.      UNG's motion to preclude the testimony of Robert Hall (Docket No. 118) is GRANTED.

6.      It is the court's understanding that UNG's motion to preclude reference to how or why UNG brought suit (Docket No. 119) has been WITHDRAWN.

BY THE COURT:

/s/ Louis H. Pollak
_____
Pollak, J.